OPINION
 

 By the Court,
 

 Maupin, J.:
 

 Appellant Tuan Ngoc Nguyen was arrested and charged with passing bad checks at the following Las Vegas gaming resorts: Harrah’s Las Vegas Hotel and Casino, the Luxor Hotel and Casino, the Excalibur Hotel Casino, and the Flamingo Hilton Hotel and Casino. Nguyen was thereafter convicted on one count of drawing and passing a check without sufficient funds in violation of NRS 205.130(1). We affirm the judgment entered thereon by the district court.
 

 FACTS
 

 Tuan Ngoc Nguyen is a resident of the state of Texas. In December of 1995, he secured gambling credit through the issuance of markers from several licensed Las Vegas gaming establishments. Each followed standard industry procedures with respect to the extension of credit to Nguyen. These procedures are described immediately below.
 

 In general, patrons apply for casino credit by completing a standard form setting forth the name of the applicant, his or her address, the name of the applicant’s bank, and the bank account number. Casino personnel approve the applications pending verification of the basic bank information, including the average balance of the applicant’s account.
 

 An applicant may receive all or a portion of the credited amount at a gaming table in the form of a “marker.” The marker
 
 *1173
 
 is an instrument, usually dated, bearing the following information: the name of the player; the name, location, and account number of the player’s bank; and the instruction “Pay to the Order of” the casino for a specific value in United States dollars. The marker also contains a stipulation whereby the payor represents that the amount drawn by the marker is on deposit in the referenced financial institution, and that he guarantees payment. The player and a casino representative sign the marker. The player then exchanges the marker for gaming tokens or “chips,” which may be exchanged for currency with the casino cashier.
 

 When a patron has concluded play, he either pays the full amount of the marker he has obtained or leaves the casino with the marker outstanding. If the marker remains outstanding, casino personnel attempt to notify the patron and, after a specified period of time, submit the marker to the patron’s bank for collection.
 
 [1]
 
 Should the bank account contain insufficient funds, the casino will again attempt contact with the patron. If payment is not forthcoming, the gaming establishment has the option to refer the customer for possible criminal prosecution.
 

 On December 9, 1995, Harrah’s Las Vegas issued a marker to Nguyen in the amount of $5,000. On December 10, 1995, he obtained markers for $5,000 from the Luxor Hotel and Casino and $2,500 from the Excalibur Hotel Casino.
 
 [2]
 
 Nguyen signed each marker and departed the state without paying the debt incurred.
 

 Each establishment sent notice to Nguyen that his obligation
 
 *1174
 
 remained outstanding. Later, each establishment sent its marker to Nguyen’s bank, the Texas First National Bank, for payment. The bank returned all of the markers with the notation, “Account Closed.” Casino representatives unsuccessfully sought to personally contact Nguyen. Thereafter, these matters were referred for prosecution and the Clark County District Attorney charged Nguyen in three criminal complaints with violations of NRS 205.130. An amended criminal complaint was filed on April 9, 1998, and a preliminary hearing held on April 14, 1998. Nguyen was held to answer and an information was filed in the district court on April 23, 1998.
 
 [3]
 

 Nguyen entered into a plea agreement with the State, pursuant to which he pleaded guilty in connection with the Harrah’s Las Vegas marker to one count of drawing and passing a check without sufficient funds in the drawee bank and with intent to defraud. The plea agreement included a provision reserving Nguyen’s right to appeal two issues: (1) whether NRS 205.130(1) applies to casino markers and (2) whether he was selectively prosecuted in violation of his right to equal protection under the Federal Constitution. The district court accepted the guilty plea and entered a judgment of conviction accordingly. This timely appeal followed.
 

 DISCUSSION
 

 The bad check statute
 

 The primary question before us is whether the term “check or draft,” as used in NRS 205.130(1), the Nevada criminal statute prohibiting the drawing or passage of “bad” checks, applies to gaming credit instruments commonly known as “markers.”
 

 The interpretation of a statute is a question of law, which we review de novo.
 
 [4]
 
 County of Clark v. Upchurch, 114 Nev. 749, 753, 961 P.2d 754, 757 (1998).
 

 The Nevada bad check statute, NRS 205.130(1), prohibits a person from drawing or passing “a check or draft” to obtain
 
 *1175
 
 “[c]redit extended by any licensed gaming establishment,” drawn on a bank “when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon its presentation.” Although NRS 205.130(1) does not explicitly define the term “check or draft,” we construe this undefined term in accordance with its ordinary and plain meaning.
 
 See
 
 Attorney General v. Board of Regents, 114 Nev. 388, 392, 956 P.2d 770, 774 (1998) (quoting McKay v. Bd. of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986)).
 

 A “draft” is “[a] written order by the first party, called the drawer, instructing a second party, called the drawee (such as a bank), to pay money to a third party, called the payee.” Black’s Law Dictionary 493 (6th ed. 1990). The Uniform Commercial Code (codified in Nevada at NRS 104.1101
 
 et seq.)
 
 defines “draft” as an “order,” a “written instruction to pay money signed by the person giving the instruction.” U.C.C. § 3-103(a)(6); U.C.C. § 3-104(e); NRS 104.3103(l)(f); NRS 104.3104(5). A “check” is an instrument drawn upon a bank and payable on demand,
 
 [5]
 
 signed by the drawer, containing an instruction to pay a certain amount to another party.
 
 See
 
 Black’s Law Dictionary 493 (6th ed. 1990); U.C.C. § 3-104(f)(i); NRS 104.3104(6)(a);
 
 see also
 
 12 C.F.R. § 210.2(h) (Federal Reserve Board definition of a check as a draft drawn on a bank and payable on demand). “An instrument may be a check even though it is described on its face by another term.” U.C.C. § 3-104(f); NRS 104.3104(6).
 

 “ “ ‘Where the language of a statute is plain and unambiguous, and its meaning clear and unmistakable, ... the courts are not permitted to search for its meaning beyond the statute itself.” ’ ” Erwin v. State of Nevada, 111 Nev. 1535, 1538-39, 908 P.2d 1367, 1369 (1995) (quoting Charlie Brown Constr. Co. v. Boulder City, 106 Nev. 497, 503, 797 P.2d 946, 949 (1990) (quoting State v. Jepsen, 46 Nev. 193, 196, 209 P. 501, 502 (1922))). We believe the language of this statute is abundantly clear and unmistakable. By its terms, NRS 205.130 applies to instruments that are drawn upon a bank, payable on demand, signed by the payor, and which instruct the bank to pay a certain amount to the payee.
 

 Given the foregoing analysis, we conclude that the markers at issue in the instant case fall within the purview of the bad check statute. The markers provided a mechanism for payment of a specific sum of money from the Texas National Bank to the order of
 
 *1176
 
 these gaming establishments. Nguyen signed the instruments, which stated no time or date of payment — they were payable on demand, thus “subjecting the [drawer] payor to a repayment obligation at the will of the payee.”
 
 Fleeger,
 
 95 F. Supp. 2d at 1131. We therefore hold that these markers were “checks” within the meaning of NRS 205.130(1).
 

 Nguyen contends that the markers are better characterized as credit instruments outside the scope of NRS 205.130. According to Nguyen, the practice of delaying payment of a marker renders the instrument a loan document, whereby the signer agrees to pay the debt before an agreed-upon but unwritten disposition date. We disagree. Whether an obligee chooses to cash a check immediately or at a later date does not alter the character of the instrument. Further, there is no evidence that Nguyen and the casinos understood the marker to effect a contract for a loan.
 
 See
 
 Hillyer v. The Overman Silver Mining Co., 6 Nev. 51 (1870) (holding that parties to a contract must mutually assent to its terms).
 
 [6]
 

 We turn now to Nguyen’s contention that his conduct did not evidence sufficient criminal intent. The statute provides that, in order to be convicted for passing bad checks, a person must act “with an intent to defraud.” NRS 205.130(1). Also,
 

 [i]n a criminal action for issuing a check or draft against insufficient or no funds with intent to defraud, that intent and the knowledge that the drawer has insufficient money, property or credit with the drawee [bank] is presumed to exist if . . . [p]ayment of the instrument is refused by the drawee when it is presented in the usual course of business, unless within [five] days after receiving notice of this fact from the drawee or the holder, the drawer pays the holder of the instrument the full amount due plus any handling charges.
 

 NRS 205.132. We conclude that Nguyen’s intent to defraud was circumstantially demonstrated by his failure to pay the full amount due within the statutory period, and by the return of the instruments from his bank with the notation “Account Closed.” Thus, evidence such as that present in this case is sufficient to raise a jury question on the issue of guilt or innocence under NRS 205.130.
 

 Nguyen alternatively contends that he had no intent to defraud because the markers were post-dated instruments (meaning that
 
 *1177
 
 the instruments bore dates later than the date they were issued). He argues that, as a matter of law, post-dating a check is prima facie evidence that there is no intent to defraud.
 
 See
 
 State v. Stooksberry, 872 S.W.2d 906 (Tenn. 1994); State v. Papillon, 389 N.W.2d 553 (Neb. 1986);
 
 see also
 
 U.C.C. § 3-113(a); NRS 104.3113(1) (“an instrument payable on demand is not payable before the date of the instrument.’ ’)
 

 We disagree. Assuming Nguyen’s argument is based upon a correct statement of Nevada law (we have never addressed the issue), the markers in this case were
 
 not
 
 post-dated. Rather, they bore the date upon which they were executed. Nguyen also argues that the agreement by the gaming establishments to hold the markers for a period of time rendered them the “equivalent” of postdated checks. However, just as there is no evidence here that the parties intended the markers to represent a loan instrument, there is no evidence that the parties mutually understood that the markers were post-dated checks. The face of the documents demonstrates that they were payable on demand, at the time of issuance.
 

 Nguyen further argues that, under State v. Jarman, 84 Nev. 187, 438 P.2d 250 (1968), he cannot be prosecuted under NRS 205.130(1). In
 
 Jarman,
 
 we held that this provision does not apply to checks issued to pay preexisting debts. The gravamen of the offense, we noted, is the intent to defraud.
 
 Id.
 
 at 190, 438 P.2d at 252-53. Payment of a preexisting debt with an instrument backed with insufficient funds does not, in and of itself, confer any benefit on the maker because the debt remains unaffected.
 
 Id.
 

 Nguyen asserts that the agreements to delay collection transformed the markers into instruments memorializing preexisting debts. Such transactions, he contends, fall outside the scope of NRS 205.130. This assertion lacks merit. The markers issued in these instances did not compensate these establishments for preexisting debts. Rather, Nguyen executed the markers to purchase gaming tokens, which he could exchange for currency. In this manner, Nguyen deprived the casinos of property.
 
 Jarman
 
 is inap-posite, and we reject Nguyen’s contention to the contrary.
 

 Accordingly, we hold that Nguyen was properly convicted under NRS 205.130.
 

 Equal protection
 

 Nguyen next contends that he has been selectively prosecuted in this matter. A denial of equal protection may occur when a facially valid statute is applied in an arbitrary or discriminatory manner.
 
 See
 
 City of Las Vegas v. 1017 S. Main Corp., 110 Nev. 1227, 1235, 885 P.2d 552, 557 (1994) (citing Yick Wo v.
 
 *1178
 
 Hopkins, 118 U.S. 356, 373-74 (1886)). Such a denial violates the Fourteenth Amendment of the Federal Constitution.
 
 [7]
 

 Nguyen argues that the State maintains a double standard in prosecuting persons securing agreements to hold checks for later deposit. According to Nguyen, the State prosecutes such actions under NRS 205.130 when a casino is a party to the agreement, but not when other classes of businesses agree to delay depositing checks.
 

 We find this contention to be without merit. As noted earlier, the casino markers in this case were not pre-dated checks or credit instruments, or the “equivalent” of post-dated checks. The markers were, as we have concluded, simply checks, payable on demand and facially negotiable at the time of issuance. Nguyen offers no particularized evidence demonstrating how these alleged offenses were selectively prosecuted. We therefore hold that the State has not, via the instant prosecution, denied Nguyen equal protection of the law.
 

 CONCLUSION
 

 We hold that Nguyen was properly prosecuted under NRS 205.130. We also hold that Nguyen’s contention that he was deprived of his rights under the Federal Constitution is without merit. Accordingly, we affirm the district court’s judgment of conviction.
 

 Young and Becker, JJ., concur.
 

 [1]
 

 A representative of Harrah’s described the casino’s practice of deferring deposit of the marker:
 

 Q. What is the date on that check?
 

 A. On the marker? 12/9 of ‘95.
 

 Q. And on the back, does it indicate when that check was deposited to Harrah’s account?
 

 A. January 11th of ‘96.
 

 Q. That is more than 30 days?
 

 A. Yes it is.
 

 Q. [The cashiers] don’t deposit [the markers] when they get them?
 

 A. Everybody has a different disposition date, 30 days, 90 days.
 

 Q. What is the disposition date [for Harrah’s]?
 

 A. Thirty days.
 

 Q. What does it mean?
 

 A. If a customer has a 30-day disposition date, they have 30 days from the time they sign the marker to send us a check, and after those 30 days, we usually allow seven days for them to put a check in the mail.
 

 The practice of allowing a customer to pay gaming debts with a second check is a matter of courtesy and convenience to the customer.
 

 [2]
 

 Nguyen allegedly also passed a bad check at the Flamingo Hilton Hotel and Casino. There is no indication in the record that the check at issue in that transaction was a marker.
 

 [3]
 

 The information charged twelve counts: four counts of drawing and passing a check without sufficient funds with intent to defraud; four counts alleging theft by material misrepresentations; and four counts alleging theft by obtaining property or services knowing the checks would not be paid when presented.
 

 [4]
 

 In Fleeger v. Bell, 95 F. Supp. 2d 1126 (D. Nev. 2000), the United States District Court for the district of Nevada was called upon to construe NRS 205.130(1). Our ruling today marks our agreement with the federal court’s interpretation of this provision.
 

 [5]
 

 “A promise or order is ‘payable on demand’ if it: (a) States that it is payable on demand or at sight; (b) Otherwise indicates that it is payable at the will of the holder; or (c) Does not state any time of payment.” NRS 104.3108(1);
 
 see also
 
 U.C.C. § 3-108(a).
 

 [6]
 

 We decline to hold, as urged by Nguyen, that the markers in this case were “pre-dated” checks, that is, checks held by the casinos pursuant to a contract of future deposit. This argument is essentially identical to Nguyen’s contention that a marker is the “equivalent” of a post-dated check.
 
 See infra
 
 at 8. The mere fact that markers are held for a period of time prior to deposit does not evidence such a contract.
 

 [7]
 

 “No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const. amend. XIV, § 1.